ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL IV

| | | |
|---|---|---|
| PUBLIC ASSISTANCE CONSULTANTS INTERNATIONAL INC. <br><br> Peticionario <br><br> v. <br><br> DEPARTAMENTO DE SALUD DE PUERTO RICO; Y OTROS <br><br> Recurrido | KLCE202300840 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala de San Juan <br><br> Caso Número: SJ2022CV05213 <br><br> Sobre: Cobro de dinero- Ordinario |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y el Juez Rodríguez Flores

Rivera Marchand, Jueza Ponente

**RESOLUCIÓN**

En San Juan, Puerto Rico, a 27 de septiembre de 2023.

Comparece ante nosotros Public Assistance Consultants International Inc. (PACI o peticionario) y nos solicita la revocación de una *Resolución*[1] del Tribunal de Primera Instancia, Sala de San Juan (TPI o foro primario), emitida y notificada el 24 y 25 de mayo de 2023, respectivamente. En ella, el foro primario denegó la Moción Solicitando Sentencia Sumaria[2] que instó PACI.

Por los fundamentos que exponemos a continuación, denegamos la expedición del auto de *certiorari*.

**I.**

En el presente caso, PACI incoó una *Demanda*[3] sobre cobro de dinero e incumplimiento de contrato en contra del Departamento de Salud y del Estado Libre Asociado de Puerto Rico (Departamento o recurrido). Se desprende de sus alegaciones que PACI reclamó el pago de $378,088.25, por concepto de los servicios de consultoría

---

[1] Apéndice, págs. 627-656.
[2] Apéndice, págs. 11-512.
[3] Apéndice, págs. 1-3.

presuntamente brindados con el propósito de obtener recursos, fondos y/o subvenciones ante el Federal Emergency Management Agency (FEMA), en virtud del contrato 2019-DS0756.

En respuesta, el Departamento acreditó su alegación responsiva[4] en la cual negó la mayoría de las alegaciones y expuso que la facturación objetada no cumple con los requisitos de la Ley Núm. 230 de 23 de julio de 1974, conocida como la Ley de Contabilidad del Gobierno de Puerto Rico (Ley Núm. 230-1974), 3 LPRA secs. 283, *et seq.* En particular, contienen incongruencias en fechas y detalles, carecen de documentos de soporte, entre otros defectos, lo cual impide su procesamiento y el ulterior desembolso de fondos públicos.

Superadas las etapas iniciales del pleito, PACI instó un petitorio sumario.[5] En su escrito expuso que los servicios facturados se proveyeron conforme a lo acordado y que los requerimientos y objeciones del Departamento sobre las facturas son formalismos que ya se atendieron y que no constituyen controversias de hechos medulares que incidan sobre la solución sumaria de este caso. Alegó que, no existe duda de que el Departamento le adeuda $378,088.25 por los servicios brindados y facturados, por lo cual, suplicó al foro primario que emita un dictamen sumario y que ordene al Departamento pagarle la referida cuantía, más intereses, gastos y honorarios.

A lo antes, el Departamento se opuso[6] e insistió en que la deuda reclamada no es líquida, vencida y exigible. Ello, tras

---

[4] Apéndice, págs. 4-10.

[5] Junto a su petitorio sumario, PACI presentó los siguientes documentos: Anejo 1-Professional Services Agreement, Contrato número 2019-DS0756; Anejo 2-Declaración jurada suscrita por el Sr. Rickey G. Conradt; Anejo 3-Factura ID-100-R2; Anejo 4-Factura ID-103; Anejo 5-Factura ID-104; Anejo 6-Correo electrónico suscrito por el Lic. Eric Rubén Huertas Morales el 28 de mayo de 2020; Anejo 7-Correo electrónico suscrito por el Sr. Rickey Gene Conradt el 7 de febrero de 2020; Anejo 8-Carta suscrita por el Lic. Miguel A. Verdiales Morales con fecha del 26 de junio de 2020 y Anejo 9-Carta suscrita por el Lic. Daniel F. Marrero Guerrero con fecha del 2 de mayo de 2022. Apéndice, págs. 11-512.

[6] En su oposición a la solicitud de sentencia sumaria, el Departamento incluyó los siguientes anejos: Anejo 1-Factura 100; Anejo 2-Factura 100 R-2; Anejo 3-

identificar 32 señalamientos sobre falta de información o documentación que le impiden corroborar la corrección de los servicios descritos y el tiempo dedicado a su ejecución. Abundó que, la información requerida es también necesaria para fines fiscalizadores ante cualquier auditoría posterior. A tales efectos, el Departamento propuso 50 hechos incontrovertidos adicionales, los cuales sustentó con diversos documentos, entre ellos, una declaración jurada de Taileen Yazmin Negrón Rivera, Supervisora y Coordinadora General de la Oficina de Manejo y Reclamaciones por Desastres (OMRD) del Departamento de Salud.[7]

En reacción, PACI replicó,[8] sin sustentar sus alegaciones con anejos, a lo cual el Departamento duplicó.[9] Evaluada la solicitud de sentencia sumaria de PACI, la oposición del Departamento y los escritos subsiguientes, el TPI dictó la *Resolución* impugnada en la cual formuló las siguientes determinaciones de hechos:

1. El Departamento de Salud suscribió el contrato número 2019-DS0756 con PACI, para que PACI solicitara fondos a FEMA por los daños sufridos durante el huracán Irma y huracán María, como también fondos de Mitigación de Riesgos para mitigar daños futuros en caso de que se declare un desastre por el gobierno federal.
2. Según el contrato, PACI proporcionaría servicios diseñados para solicitar fondos de FEMA de manera adecuada, agilizaría el proceso y administraría el cierre y la auditoría del proyecto, según descritos.
3. Los servicios que prestaría PACI en virtud del contrato número 2019-DS0756 eran los siguientes: "Invoicing Tasks", "Grant Management Tasks", "Eligibility Tasks" y "Engagement Tasks".
4. Bajo "Invoicing Tasks", se acordó que PACI asistiría al Departamento de Salud en el proceso de implementación y, posteriormente, facturación de los servicios aplicables de conformidad con "1. FEMA guidelines for Management Cost (See interim FEMA Recovery Policy FP 104-11-2) ó 2. FEMA guidelines Direct Administrative Cost Entitled "Public Assistance Alternative Procedures for DAC (Version 1.1).

---

Carta suscrita por Adil Rosa Rivera el 30 de julio de 2019; Anejo 4-Factura 103 de 30 de mayo de 2019; Anejo 5-Factura 100-R2 de 17 de mayo de 2019; Anejo 6-Factura 103 de 30 de mayo de 2019; Anejo 7-Factura 104 de 28 de junio de 2019; Anejo 8-Factura 103 Listado Recursos; Anejo 9-Factura 103 Descrip Tareas; Anejo 10-Factura 104 Descripción Tareas; Anejo 11-Factura 104 FEMA DR4339; Anejo 12-Factura 100R2 Descripci[ó]n Tareas; Anejo 13-Factura 100R2 FEMA DR4339; Anejo 14-Declaración Jurada Taileen Negrón; Anejo 15-Documentos FEMA; Anejo 16-Certificación Anejos 1 al 7. Apéndice, págs. 513-613.
[7] Apéndice, págs. 585-605.
[8] Apéndice, págs. 615-622.
[9] Apéndice, págs. 623-625.

5. PACI sometió para pago unas facturas por servicios contratados que totalizan $378,088.25.

6. El 10 de mayo de 2019, PACI sometió la Factura #100 por la cantidad de $308,837.00. En esta, no aparece la firma del representante de PACI certificando que los servicios fueron prestados y que aún no se han pagado. Tampoco se detalló que ningún servidor público del Departamento de Salud es parte o tiene algún interés en las ganancias o beneficios producto del contrato, y, de haberlo, especificar si ha mediado dispensa.

7. PACI sometió la Factura #100-R2 con fecha de 30 de mayo de 2019 por la cantidad de $154,283.00. En esta, no aparece la firma del representante de PACI certificando que los servicios fueron prestados y que aún no se han pagado. Tampoco se detalló que ningún servidor público del Departamento de Salud es parte o tiene algún interés en las ganancias o beneficios producto del contrato, y, de haberlo, especificar si ha mediado dispensa.

8. El 30 de mayo de 2019, PACI sometió la Factura #103 por la cantidad de $84,117.00. En esta, no aparece la firma del representante de PACI certificando que los servicios fueron prestados y que aún no se han pagado. Tampoco se detalló que ningún servidor público del Departamento de Salud es parte o tiene algún interés en las ganancias o beneficios producto del contrato, y, de haberlo, especificar si ha mediado dispensa.

9. El 27 de septiembre de 2019, el Departamento de Salud recibió en la Factura #100-R2 de PACI con fecha de 17 de mayo de 2019 y fecha de revisada de 27 de septiembre de 2019 por la cantidad de $147,243.00. En la misma, no aparece la firma de PACI certificando que los servicios fueron prestados y que aún no se han pagado, ni que ningún servidor público del Departamento de Salud es parte o tiene algún interés en las ganancias o beneficios producto del contrato, y, de haberlo, especificar si ha mediado dispensa.

10. El 27 de septiembre de 2019, el Departamento de Salud recibió la Factura #103 con fecha de 30 de mayo de 2019 y fecha de revisada de 27 de septiembre de 2019 por la cantidad de $269,104.00 para pago. En la misma, no aparece firma de PACI certificando que los servicios fueron prestados y que aún no se han pagado, ni que ningún servidor público del Departamento de Salud es parte o tiene algún interés en las ganancias o beneficios producto del contrato, y de haberlo, especificar si ha mediado dispensa.

11. PACI sometió la Factura #104 con fecha de 28 de junio de 2019 por la cantidad de $141,608.75. En esta, no aparece la firma del representante de PACI certificando que los servicios fueron prestados y que aún no se han pagado. Tampoco se detalló que ningún servidor público del Departamento de Salud es parte o tiene algún interés en las ganancias o beneficios producto del contrato, y, de haberlo, especificar si ha mediado dispensa.

12. En la carta del 30 de julio de 2019, enviada por Adil Rosa Rivera, Secretaria Auxiliar de Administración del Departamento de Salud, a Rigoberto López Sueiras, Oficial Principal de Finanzas, reiteró que las Facturas #100-R2 y #103, con fecha de 30 de mayo de 2019 por las cantidades de $154,283.00 y $84,117.00, respectivamente, no incluyeron una descripción detallada del alcance de los servicios prestados por PACI para fundamentar las reclamaciones de pago.

13. Adil Rosa Rivera requirió a PACI que las facturas detallaran la naturaleza específica de los servicios prestados por PACI, la fecha y ubicación del lugar del proyecto donde se prestaron los servicios, y el nombre completo y cargo de la persona que realizó el trabajo. Además, indicó a PACI que las

descripciones generales del trabajo realizado no son aceptables, por lo que pago no se procesaría en ese momento.

14. En la carta del 26 de junio de 2020, dirigida a Rickey Gene Conradt, Principal Oficial Ejecutivo de PACI, el Lcdo. Miguel A. Verdiales Morales, Asesor Legal del Secretario, le señaló que la facturación de PACI no cumple con la Ley de Contabilidad de Puerto Rico, *infra.*

15. De este modo, se le devolvieron las facturas a PACI para que este detallara y/o demostrara el servicio rendido para cada uno de los "ítems" contemplados en la primera cláusula del contrato D2019-DS0756. Además, se les señaló que las facturas, según presentadas, adolecían de un estimado de daños, imprescindible para que el Departamento de Salud pudiera hacer una reclamación a FEMA.

16. En los documentos en apoyo sometidos con la Factura 100-R2, y con relación a la descripción de tareas de Erick Kisor (Senior Adjuster), se identificaron fotos del Edificio A, del interior y el exterior. No obstante, no se ha identificado un escrito con las notas y medidas tomadas que se mencionan en las tareas realizadas por Erick Kisor, como tampoco se identica [sic] las hojas de trabajo describiendo en detalle las tareas realizadas y el tiempo dedicado a las mismas. Con respecto a este ajustador, se facturaron 30 horas a $225 para un total de $6,750.00 por las tareas descritas.

17. En los documentos en apoyo sometidos con la Factura 100-R2, y con relación a la descripción de tareas de Loy Vickers (Senior Adjuster), se identificaron fotos del Edificio A, tanto del interior y exterior. Sin embargo, no se identificó escrito con las notas y medidas tomadas que se menciona entre las tareas realizadas ni se identifica entre los documentos diagramas que se hayan realizado en ausencia de planos. Además, se menciona una reunión que se realizó para discutir el progreso, no obstante, no hay minuta o escrito sobre los asuntos discutidos, o se detalló quienes eran las personas presentes, ni el tiempo de duración de la reunión.

18. En cuanto a Loy Vickers (Senior Adjuster), se mencionaron dos (2) reuniones con relación al Laboratorio del CDC en atención a inspección, seguridad y hallazgos, pero no se incluyó minuta o escrito alguno sobre los asuntos discutidos, las personas presentes y tiempo de la duración de las reuniones, que demuestren que se realizaron. Tampoco se incluyeron fotos, notas y medidas tomadas en el CDC Laboratory Building, ni se identificaron hojas de trabajo describiendo en detalle las tareas realizadas y el tiempo dedicado a las mismas. Con respecto a este ajustador, se facturaron 30 horas a $225 para un total de $6, 750.00 por las tareas descritas.

19. En los documentos en apoyo sometidos con la Factura 100-R2, y con relación a la descripción de tareas de Mickey L. Jones (Senior Adjuster), se identificaron fotos del Edificio A. No obstante, no se identificó escrito alguno con las notas y medidas tomadas, ni se identificaron hojas de trabajo describiendo en detalle las tareas realizadas y el tiempo dedicado a las mismas. Con respecto a este ajustador, se facturaron 20 horas a $225 para un total de $4,500.00 por las tareas descritas.

20. En los documentos en apoyo sometidos con la Factura 100-R2, y con relación a la descripción de tareas de Ronald Caviness (Senior Adjuster), se identificaron fotos del Edificio A. No obstante, no se identificó escrito alguno con las notas y medidas tomadas, ni se identificaron hojas de trabajo describiendo en detalle las tareas realizadas y el tiempo dedicado a las mismas. Ronald Caviness (Senior Adjuster) facturó 30 horas a $225.00 para un total de $6,750.00 por las tareas descritas.

21. En los documentos en apoyo sometidos con la Factura 100-R2, y con relación a la descripción de tareas de Jordan

Lutton (Senior Adjuster), se identificaron fotos del interior del Edificio A. Sin embargo, no se identificó escrito alguno con las notas y medidas tomadas con referencia al Edificio A. Se hace referencia a inspección, toma de fotos, notas y medidas al Edificio E, sin embargo, no se incluyeron como documentos en apoyo a la Factura #100-R2, ni se identificaron hojas de trabajo describiendo en detalle las tareas realizadas y el tiempo dedicado a las mismas. Con respecto a este ajustador, se facturaron 19.5 horas a $225.00 para un total de $4,387.50.

22. En los documentos en apoyo sometidos con la Factura 100-R2, y con relación a la descripción de tareas de Charles Lackley (Senior Adjuster), no se identificaron fotos, notas y medidas tomadas en la inspección de los Edificios E y F, ni se identificaron hojas de trabajo describiendo en detalle las tareas realizadas y el tiempo dedicado a las mismas. Con respecto a este ajustador, se facturaron 20 horas a $225.00 para un total de $4,500.00.

23. En los documentos en apoyo sometidos con la Factura 100-R2 y con relación a la descripción de tareas de Bradley Beckham (Junior Adjuster), no se identificaron fotos, notas, "sketches" y medidas tomadas en la inspección de los Edificios E, F y J, ni se identificaron hojas de trabajo describiendo en detalle las tareas realizadas y el tiempo dedicado a las mismas. Con respecto a este ajustador, se facturaron 30 horas a $150.00 para un total de $4,500.00.

24. Evaluados los documentos en apoyo sometidos con la Factura 100-R2, y con relación a la descripción de tareas de Gabriel Morales (Junior Adjuster), se identificaron fotos del exterior del Edificio A. Sin embargo, en la misma no se acompañó, con respecto a la inspección exterior, medidas y sketches de paredes, ventanas y puertas. Tampoco se incluyeron las notas documentando los daños a los que se hace referencia ni se identificaron hojas de trabajo describiendo en detalle las tareas realizadas y el tiempo dedicado a las mismas. Con respecto a este ajustador, se facturaron 19.5 horas a $150.00 para un total de $2,925.00.

25. En los documentos en apoyo sometidos con la Factura 100-R2, y con relación a la descripción de tareas de John Graham (Junior Adjuster), no se incluyeron fotos, notas ni sketches para estimar daños de los Edificios E, F, J y H, ni se identificaron hojas de trabajo describiendo en detalle las tareas realizadas y el tiempo dedicado a las mismas. Con respecto a este ajustador, se facturaron 20 horas a $150.00 para un total de $3,000.00.

26. En cuanto a las fotos del interior y exterior del Edificio A que se acompañaron a la Factura 100-R2, más de un ajustador describe en sus tareas que tomó fotografías de dicho edificio. No obstante, no se incluye información suficiente para que se pueda identificar el ajustador en particular que tomó cada una de las fotografías, como tampoco el tiempo incurrido en esa tarea por cada uno de ellos.

27. Las Hojas de "Direct Administrative Cost" (DAC) de la Factura 100-R2 no detallan los documentos digitalizados; no detallan los documentos que se entran al sistema; no detalla a que proyecto corresponden los estimados de costos; no detalla las visitas que estuvieron coordinando; no especifica las facilidades; no menciona a qué proyectos corresponden las fotos digitalizadas; carece de información detallada en cuanto a cuando se realizaron las reuniones con el equipo de PACI; y documentan varias reuniones sin descripciones de las personas participantes ni el propósito.

28. En los documentos en apoyo sometidos con la Factura 103, y con relación a la descripción de tareas de Charles Lackey (Senior Adjuster) se identificaron fotos del Edificio J y fotos del Edificio H. No obstante, no se identificaron notas y medidas tomadas, ni se identificaron hojas de trabajo

describiendo en detalle las tareas realizadas y el tiempo dedicado a las mismas. Tampoco se identificó documento de estimado de daños mencionado. Se facturó la tarifa de $225.00 por hora la tarea de entrada de datos de un "Senior Adjuster". No se utilizó el recurso identificado por PACI de "Administrative Specialist" a una tarifa de $58.00 por hora para la entrada de dichos datos. Por este ajustador, se presentó una factura por 52 horas a $225.00 para un total de $11,700.00.

29. En los documentos en apoyo sometidos con la Factura #103, y con relación a la descripción de tareas de Ronald Caviness (Senior Adjuster), en cuanto al CDT Maunabo, no se incluyeron fotos, notas y/o anotaciones y medidas de daños. En cuanto a lo mencionado sobre el Edificio A, no hay estimados de costos en los documentos de apoyo ni se identificaron hojas de trabajo describiendo en detalle las tareas realizadas y el tiempo dedicado a las mismas. Con respecto a este ajustador, se facturaron 20 horas a $225.00, para un total de $4,500.00.

30. En los documentos en apoyo sometidos con la Factura #103 y con relación a la descripción de tareas de Erick Kisor (Senior Adjuster), en cuanto al CDT Maunabo, no se identificaron fotos, notas y/o anotaciones o medida de los daños. En cuanto al Edificio A, no hay estimado de daños entre los documentos sometidos a pesar de que se hace mención de que realizó dicha tarea. En cuanto al Edificio E, no se identificaron fotos, notas y/o anotaciones o medidas de los daños. En cuanto al Edificio J, se identificaron fotos solamente. Sin embargo, no se acompañaron notas y/o anotaciones o medidas de los daños a los que se hace referencia, ni se identificaron hojas de trabajo describiendo en detalle las tareas realizadas en las facilidades CDT Maunabo, Edificio A, Edificio E y Edificio J y el tiempo dedicado a las mismas. Con respecto a este ajustador, se facturaron 50 horas a $225.00 para un total de $11,250.00.

31. En los documentos en apoyo sometidos con la Factura #103, y con relación a la descripción de tareas de Loy Vickers (Senior Adjuster), en cuanto al CDT Maunabo no se identificaron fotos, notas o anotaciones o medidas de los daños ni hay referencia alguna en cuanto a lo discutido con los "estimators", nombres de las personas y resultado de las discusiones en relación con la preparación del reporte de daños de esta facilidad. En cuanto al Edificio A, no hay referencia escrita alguna sobre los trabajos relacionados al estimado de daños de dichas facilidades, ni se identificó foto aérea o infra rojo en cuanto a Edificio E. Tampoco hay notas o anotaciones o medida de los daños. En cuanto al Edificio J, se hace mención de que se inspeccionó el interior cuarto a cuarto y exterior, sin embargo, solamente se identificaron fotos exteriores. No se identificaron notas o anotaciones o medida de daños ni hay récord alguno de la reunión con los "estimators", ni se identificó quienes eran y el resultado de esta. Tampoco se identificaron hojas de trabajo describiendo en detalle las tareas realizadas en el CDT Maunabo, Edificio A, Edificio E y Edificio J y el tiempo dedicado a las mismas. Con respecto a este ajustador, se facturaron 50 horas a $225.00 para un total de $11,250.00.

32. Evaluados los documentos en apoyo sometidos con la Factura #103, con relación a la descripción de tareas de Gabriel Morales, en cuanto al Edificio J, no se incluye récord/minuta alguna sobre la reunión con personal en las facilidades, nombre de los asistentes, asuntos discutidos y resultado de dicha reunión. Se identificaron fotos del generador y del área relacionada. No obstante, no se identificó entre los documentos dibujo alguno (sketches) de las paredes, ventanas o puertas. Se identificaron fotos del exterior. Sin embargo, no se incluyó documentación de los

daños a los que se hace referencia. En cuanto al Hospital Ruiz Soler, no se incluyó récord/minuta alguna sobre la reunión con el personal en las facilidades, nombre de los asistentes, asuntos discutidos y resultado de dicha reunión. Las fotos que se incluyen son solo del generador. Tampoco se identificó entre los documentos hojas de trabajo, describiendo en detalle las tareas realizadas y el tiempo dedicado a las mismas en las facilidades Edificio J y Hospital Ruiz Soler. Con respecto a este ajustador, se facturaron 20 horas a $150.00 para un total de $3,000.00.

33. En los documentos en apoyo sometidos con la Factura #103, y con relación a la descripción de tareas de Bradley Beckham (Junior Adjuster) en cuanto al Edificio J no se incluyó documentación alguna en cuanto a medidas y dibujos de paredes, ventanas y puertas ni se acompañaron notas o documentación alguna en cuanto a daños a los que se hizo referencia. En cuanto al Edificio Ruiz Soler, tampoco se incluyó documentación alguna en cuanto a medidas y dibujos de paredes, ventanas y puertas, ni se acompañaron notas o documentación alguna en cuanto a daños a los que se hace referencia. No se incluyeron hojas de trabajo describiendo en detalle las tareas realizadas y el tiempo dedicado a las mismas en las facilidades Edificio J y Hospital Ruiz Soler. Con respecto a este ajustador, se facturaron 20 horas a $150.00 para un total de $3,000.00.

34. Evaluados los documentos en apoyo sometidos con la Factura 103 y con relación a la descripción de tareas de John Graham (Junior Adjuster), se hizo una descripción idéntica de tareas para las facilidades Edificio J, CDT Maunabo, Hospital Ruiz Soler y Edificio H facturando un total de 39 horas. Dichas facilidades fueron inspeccionadas por otros ajustadores en diferentes fechas con el mismo propósito de "scoping". Además, no se incluyeron notas o anotaciones o medidas de los daños a las que se hizo referencia en las facilidades inspeccionadas, ni se acompañaron notas o documentación alguna en cuanto a daños. Tampoco se incluyeron hojas de trabajo describiendo en detalle las tareas realizadas y el tiempo dedicado a las mismas en las facilidades Edificio J, CDT Maunabo, Hospital Ruiz Soler y Edificio H. Con respecto a este ajustador, se facturaron 39 horas a $150.00 para un total de $5,850.00.

35. En la Factura 103, varios ajustadores hacen referencia a que tomaron fotografías en una facilidad en particular, sin embargo, no se pueden identificar las fotos tomadas por cada uno de ellos. Además, se identificó la situación, con el Hospital Ruiz Soler, donde los ajustadores Gabriel Morales, Bradley Beckham y John Graham mencionan que tomaron fotos de dicha facilidad, pero solamente se incluyeron fotos del generador y tanque de combustible que menciona solamente el ajustador Gabriel Morales en sus tareas.

36. Bajo la categoría de Project Listing Development/Data Collection and Dissemination, se facturaron 232.5 horas en costos indirectos por diferentes recursos de PACI. No obstante, no se acompañaron hojas de trabajos describiendo en detalle las tareas realizadas y el tiempo dedicado a las mismas junto con la Factura #103.

37. En la Factura #103 se menciona que se celebraron seis (6) reuniones. Sin embargo, no se acompañó con la factura ninguna minuta o memorando en donde se identifique por sus nombres y puestos o funciones a los participantes, los temas discutidos y los resultados o acuerdos tomados, entre otros.

38. Austin Jehl (Senior Adjuster) factura $225 por hora. En la Factura #103, este ajustador senior facturó un total de $13,275.00, o 59 horas, en seis (6) días realizando la misma tarea, que consistió en "Inputting data into computer system to prepare logistical plan for scheduling of site visits". Se

utilizó recurso de la tarifa más alta para dicha tarea y no otro disponible de menor tarifa y acorde al tipo de tarea.

39. Evaluados los documentos sometidos con la Factura #104, y con relación a la descripción de tareas de Alan Heinsen (Principal Engineer), se identificó que dedicó un total 113 horas facturando un total de $31,640 en tareas relacionadas a un reporte de los daños sufridos en los Edificios H, J y E. No obstante, en los documentos en apoyo sometidos con la Factura #104 no hay ninguno que demuestre que se realizaron las tareas facturadas en estos tres (3) edificios. Los documentos que se acompañaron se limitan a notas de campo y planos de piso del Edificio A. Por otro lado, se mencionó que, el 7 de mayo de 2019 se celebró una reunión con respecto al Edificio H con FEMA, pero no se acompañó con la factura reporte alguno sobre los temas discutidos, nombres de las personas presentes en la reunión, acuerdos o cursos de acción a seguir, etc. Con respecto a este ingeniero, se facturaron 105 horas a $280.00.00 para un total de $29,400.00.

40. Evaluados los documentos sometidos con la Factura #104, con relación a la descripción de tareas de Igrain Alamo (Engineer 2-Designer), se identificó que este dedicó un total de 17 horas, facturando un total de $2,125.00, en tareas relacionadas a dibujos con respecto a los Edificios H y J. No obstante, en los documentos en apoyo sometidos con la Factura #104, no hay ninguno que demuestre que se realizaron las tareas facturadas en estos dos (2) edificios. Los dibujos que se identifican con la Factura #104 son con respecto al Edificio A. Con respecto a este ingeniero, se facturaron 17 horas a $125.00 cada una, para un total de $2,125.00.

41. Evaluados los documentos en apoyo sometidos con la Factura #104 y con relación a la descripción de tareas de David Soto Delgado (Engineer 1-Drafter), se identificó que este dedicó 81 horas, por lo que facturó $8,100.00 por visitar los Edificios H y J. Sin embargo, con la factura no se proveyó reporte alguno que demuestre las tareas o gestiones realizadas durante dichas visitas. Además, se identificó que este dedicó 45 horas en recolección y revisión de data, sketches, notas y reportes de los Edificios J y H, para un total de $4,500.00, pero no se acompañaron hojas de trabajo sobre la ejecución de estas tareas y el resultado o propósito de estas. Con respecto a este ingeniero, se facturaron 126 horas a $100.00 cada una, para un total de $12,600.00.

42. Evaluado los documentos que acompañan la Factura #104, se identificó que Christian J. Betancourt (Engineer 1-Drafter) facturó 86 horas por la revisión de "plans data" con respecto a los Edificios H y J, para un total de $8,600.00 No obstante, no se acompañó con la Factura #104, hojas de trabajo de este recurso con anotaciones de los resultados o hallazgos de la revisión realizada.

43. Evaluados los documentos que acompañan la Factura #104, se identifica que Osvaldo J. Aranda (Project Engineer-1-EIT) menciona que visitó los Edificios J y H para realizar inspecciones. Sin embargo, no se acompañó con la Factura #104 informes o reporte alguno de inspección, que demuestre el trabajo realizado. Además, se mencionaron tareas relacionadas a un reporte de daños en los Edificios H y E. No obstante, no se acompañó reporte final o borrador alguno que demuestre el trabajo que se facturó. Con respecto a este ingeniero, se facturaron 66 horas a $180.00 cada una, para un total de $11,880.00.

44. Evaluados los documentos que acompañan la Factura #104 se identificó que Luis A. Román (Engineer-2-Designer) realizó una serie de dibujos con respecto a los Edificios H y J. Sin embargo, no se acompañó con la Factura #104 dibujos con

respecto a estas facilidades que demuestren el trabajo realizado, por el que se facturó $6,906.00.

45. Durante el periodo del 22 de mayo al 21 de junio de 2019, parte del equipo estuvo compuesto por dos (2) FEMA SME, a saber, Shaurice Mullins y Angélica Maldonado. Dentro de sus labores se destacan; revisión de la documentación actualizada de los solicitantes del Departamento de Salud, revisión de las horas de trabajo de los proyectos, evaluación del progreso de los trabajos, recomendación al Departamento de Salud en cuanto a los costos directos en cumplimiento con FEMA y los proyectos categoría E. Por estas tareas fueron facturadas 129 horas que totalizan $32,250.00. Sin embargo, no se sometieron hojas de trabajos de estos dos recursos que demuestre que dicho trabajo se realizó.

46. Se hace referencia a discusiones y reuniones para atender asuntos relacionados a los trabajos evaluación de daños, entre otros, sin embargo, no se acompañó ningún documento que informe los temas discutidos, las personas presentes, acuerdos o cursos de acción a seguir, entre otros. Angélica Maldonado, FEMA SME I, mencionó, entre las tareas realizadas, una visita al Centro de Diagnóstico y Tratamiento (CDT) en Vieques, sin embargo, la misma no fue visitada.

47. PACI indicó que John J. Graham (Jr. Adjuster) realizó la tarea de tomarle fotos y realizar notas de los daños y medidas, entre otros, a los Edificios J, E, al Hospital Pediátrico, al Centro Autismo y al Hospital Dr. Ruiz Arnau. Sin embargo, no se acompañaron fotos ni documentación alguna con la Factura #104 que demuestre el trabajo realizado. Las horas facturadas fueron 45.5 a razón de $150.00 cada una, para un total de $6,825.00.

48. PACI también indicó que Eric Kisor (Senior Adjuster) realizó la tarea de revisión de notas tomadas sobre los daños y fotos, valoración de daños hasta aquel momento de las facilidades, entre otros en los Edificios H, E, J, el Hospital Pediátrico, y el Hospital Universitario de Adultos. No obstante, no se acompañó con la Factura #104 fotos ni notas ni otra documentación que demuestre que el trabajo se realizó. Las horas facturadas por este trabajo fueron 63 a razón de $225.00 cada una, para un total de $14,175.00.

49. PACI indicó que Charles Lackey (Senior Adjuster), realizó la tarea de tomar fotos, medidas, y análisis de data sobre daños en los Edificios E, H, Centro Autismo, CDT Florida, CDT Vega Alta, CDT Vega Baja, CDT Cataño, CDT Dorado, Hospital Universitario de Adultos, Hospital Dr. Ruiz Arnau. No obstante, no se acompañó con la Factura #104 fotos ni notas o análisis ni otra documentación que demuestre que se realizó el trabajo. Las horas facturadas por este trabajo fueron 71 a razón de $225 cada una, para un total de $15,975.00.

50. Las Hojas de DAC disponibles correspondiente a trabajo en oficina no detallan los documentos digitalizados; no detallan los documentos que se entran al sistema; no detalla a que proyecto corresponden los estimados de costos; no detalla las visitas que estuvieron coordinando; y no especifica las facilidades.

51. Los requerimientos de información y documentos solicitados por el Departamento de Salud para estar en posición de evaluar la corrección de las facturas en cuanto al trabajo realizado diariamente son cónsonos con las políticas de FEMA en cuanto a DAC.

52. Hubo intercambios de comunicaciones entre representantes de PACI y el Departamento de Salud para exponer y atender las objeciones/requerimientos en cuanto a las facturas sometidas para pago.

En su dictamen, el foro primario identificó cuatro hechos medulares en controversia. Entre ellos se destaca que, concluyó que la deuda que reclamó el peticionario no es líquida ni exigible. Ello, debido a que existe una controversia medular con respecto a si la evidencia que entregó PACI para sustentar las facturas pendientes de pago es suficiente y cumple con los requerimientos de la Ley Núm. 237-2004, Ley para Establecer Parámetros Uniformes en los Procesos de Contratación de Servicios Profesionales y Consultivos para las Agencias y Entidades Gubernamentales del ELA (Ley Núm. 237-2004), 3 LPRA secs. 8611 *et seq.,* y la Ley Núm. 230-1974, *supra.*

Al resolver, el TPI puntualizó que, el Departamento tiene el deber ministerial de proteger el desembolso de los fondos públicos. Expuso además que, en el ejercicio de tal deber, el Departamento ha de velar porque las facturas sometidas para pago detallen los servicios rendidos y el tiempo incurrido a modo de corroborar su corrección.

Sobre tales bases, el TPI denegó el petitorio sumario y ordenó a PACI proveer la documentación que justifique la concesión de las cuantías reclamadas, de conformidad con las leyes aplicables. El referido dictamen fue objeto de reconsideración y, evaluadas las posturas de ambas partes, el foro primario se negó a reconsiderar.[10]

En desacuerdo aún, el peticionario acude ante esta Curia mediante el recurso de epígrafe y levanta la comisión de dos errores*:*

> Erró el TPI al concluir que existen "controversias esenciales" que impiden se dicte sentencia sumaria sin identificar con especificidad cuál hecho material quedó genuinamente y de buena fe controvertido a la luz del contrato.

> Erró el TPI al hacer 44 de las 51 determinaciones de hechos, pues no encuentran apoyo en la prueba documental.

---

[10] Apéndice, pág. 673.

En cumplimiento con nuestra *Resolución*, el recurrido acredita su alegato en oposición. Allí discute que, el foro primario actuó correctamente al determinar que existe controversia sobre la suficiencia de los documentos que sustentan las facturas objeto de este litigio y al concluir, basado en lo anterior, que la deuda reclamada no está vencida, líquida y exigible.

Con el beneficio de las comparecencias de las partes, resolvemos.

**II.**

**A. *Certiorari***

El recurso de *certiorari* es un auto procesal extraordinario por el cual un peticionario solicita a un tribunal de mayor jerarquía que revise y corrija las determinaciones de un tribunal inferior. *Rivera Gómez y otros v. Arcos Dorados Puerto Rico, Inc. y otros*, 2023 TSPR 65, resuelto el 8 de mayo de 2023; *Torres González v. Zaragoza Meléndez*, 2023 TSPR 46, resuelto el 12 de abril de 2023. Es norma reiterada que, una resolución u orden interlocutoria, contrario a una sentencia, es revisable ante el Tribunal de Apelaciones mediante auto de *certiorari. Rivera Gómez y otros v. Arcos Dorados Puerto Rico, Inc. y otros*, supra. A diferencia del recurso de apelación, el tribunal revisor tiene la facultad de expedir el auto de *certiorari* de manera discrecional. *Torres González v. Zaragoza Meléndez,* supra.

Por su parte, la Regla 52.1 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 52.1, limita la facultad que tiene el foro apelativo intermedio para revisar las resoluciones u órdenes interlocutorias que emite el foro primario. *Caribbean Orthopedics v. Medshape, et al.*, 207 DPR 994 (2021). Esa regla establece que el recurso de *certiorari* solo se expedirá cuando se recurra de una resolución u orden bajo remedios provisionales de la Regla 56, *injunctions* de la Regla 57 o de la denegatoria de una moción de carácter dispositivo. *Torres González v. Zaragoza Meléndez,* supra.

No obstante, la citada la Regla 52.1, también dispone que el tribunal apelativo, en su ejercicio discrecional y por excepción, podrá expedir un recurso de *certiorari* cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, en asuntos relacionados a privilegios evidenciarios, en casos de anotaciones de rebeldía, en casos de relaciones de familia, en casos revestidos de interés público o en cualquier otra situación en la que esperar a una apelación constituiría un fracaso irremediable de la justicia. *Íd.* El delimitar la revisión a instancias específicas tiene como propósito evitar las "dilaciones innecesarias, el fraccionamiento de causas y las intervenciones a destiempo." *Íd.*; Véase, además, *Scotiabank v. ZAF Corp., et al.*, 202 DPR 478, 486-487 (2019).

Por otro lado, el examen que hace este Tribunal previo a expedir un auto de *certiorari* no se da en el vacío ni en ausencia de otros parámetros. *Torres González v. Zaragoza Meléndez,* supra. A esos efectos, la Regla 40 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 40, señala los criterios que debemos tomar en consideración al evaluar si procede expedir el auto de *certiorari*. La citada Regla dispone:

> El Tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:
>
> (A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
>
> (B) Si la situación de hechos planteada es la más indicada para el análisis del problema.
>
> (C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
>
> (D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

El foro apelativo debe ejercer su facultad revisora solamente en aquellos casos en los cuales se demuestre que el dictamen emitido por el foro de instancia es arbitrario o constituye un exceso de discreción. *Pueblo v. Rivera Montalvo,* 205 DPR 352 (2020).

### B. Sentencia Sumaria

El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R.36, permite a los tribunales disponer, parcial o totalmente, de litigios civiles en aquellas situaciones en las cuales no existe controversia real y sustancial de un hecho material que requiera ventilarse en un juicio plenario, por lo cual solo resta aplicar el derecho. *Oriental Bank v. Caballero García,* 2023 TSPR 103, resuelto el 23 de agosto de 2023. Este mecanismo lo puede utilizar la parte reclamante o aquella parte que se defiende de una reclamación. 32 LPRA Ap. V, R. 36.1 y 36.2.

Mediante el mecanismo de sentencia sumaria, se procura profundizar en las alegaciones para verificar si, en efecto, los hechos ameritan dilucidarse en un juicio. *León Torres v. Rivera Lebrón,* 204 DPR 20, 42 (2020). Este cauce sumario resulta beneficioso tanto para el tribunal, como para las partes en un pleito, pues se agiliza el proceso judicial, mientras simultáneamente se provee a los litigantes un mecanismo procesal encaminado a alcanzar un remedio justo, rápido y económico. *Universal Insurance Company y otro v. Estado Libre Asociado de Puerto Rico y otros,* 2023 TSPR 24, resuelto el 7 de marzo de 2023; *Segarra Rivera v. Int'l Shipping et al.,* 208 DPR 964 (2022). Como se sabe, procede dictar sentencia sumaria si se desprende de las alegaciones, deposiciones,

declaraciones juradas, contestaciones a interrogatorios, admisiones ofrecidas, entre otros, que no existe controversia real sustancial sobre un hecho esencial y pertinente, y siempre que el derecho aplicable así lo justifique. *González Meléndez v. Municipio Autónomo de San Juan y otros,* 2023 TSPR 95, resuelto el 24 de julio de 2023. De manera que, en aras de prevalecer en una reclamación, la parte promovente debe presentar prueba incontrovertible sobre todos los elementos indispensables de su causa de acción. *Íd.*

Nuestro ordenamiento civil y su jurisprudencia interpretativa impone unos requisitos de forma con los cuales hay que cumplir al momento de presentar una solicitud de sentencia sumaria, a saber: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la cual se solicita la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales se debe dictar la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. *Oriental Bank v. Caballero García,* supra. Véase, además, la Regla 36.3 de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3. Si el promovente de la moción incumple con estos requisitos, "el tribunal no estará obligado a considerar su pedido". *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 111 (2015).

Cabe destacar que, "la parte que desafía una solicitud de sentencia sumaria no puede descansar en las aseveraciones o negaciones consignadas en su alegación". *León Torres v. Rivera Lebrón,* supra, pág. 43. Por el contrario, la Regla 36.3(c) de las Reglas

de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(c), obliga a quien se opone a que se declare con lugar esta solicitud a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho el promovente puesto que, si incumple, corre el riesgo de que se dicte sentencia sumaria en su contra, si la misma procede en derecho. *Íd.*

Por ello, en la oposición a una solicitud de sentencia sumaria, el promovido debe puntualizar aquellos hechos propuestos que pretende controvertir y, si así lo desea, someter hechos materiales adicionales que alega no están en disputa y que impiden que se dicte sentencia sumaria en su contra. *León Torres v. Rivera Lebrón,* supra. Claro está, para cada uno de estos supuestos, deberá hacer referencia a la prueba específica que sostiene su posición, según exigido por la antes citada Regla 36.3 de Procedimiento Civil. *Íd.* En otras palabras, la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa. *Íd.* De lo anterior se puede colegir que, ante el incumplimiento de las partes con las formalidades de la Regla 36 de Procedimiento Civil de 2009, *supra*, la consideración de sus posiciones descansa en la sana discreción del Tribunal.

Al atender la solicitud, el Tribunal deberá asumir como ciertos los hechos no controvertidos que se encuentren sustentados por los documentos presentados por el promovente. *E.L.A. v. Cole*, 164 DPR 608, 626 (2005). Toda inferencia razonable que pueda surgir de los hechos y de los documentos se debe interpretar en contra de quien solicita la sentencia sumaria, pues sólo procede si bajo ningún supuesto de hechos prevalece el promovido. *Íd.*, pág. 625. Además, al evaluar los méritos de una solicitud de sentencia sumaria, el juzgador debe actuar guiado por la prudencia y ser consciente en todo momento que su determinación puede conllevar el que se prive

a una de las partes de su "día en corte", componente integral del debido proceso de ley. *León Torres v. Rivera Lebrón,* supra*,* pág. 44.

Sin embargo, la sentencia sumaria generalmente no procederá cuando existan controversias sobre hechos esenciales materiales, o si la controversia del caso está basada en elementos subjetivos como intención, propósitos mentales, negligencia o credibilidad. *Segarra Rivera v. Int'l Shipping et al.*, supra. Además, existen casos que no se deben resolver mediante sentencia sumaria porque resulta difícil reunir la verdad de los hechos mediante declaraciones juradas o deposiciones. *Jusino et als. v. Walgreens*, 155 DPR 560, 579 (2001). De igual modo, no es apropiado resolver por la vía sumaria "casos complejos o casos que involucren cuestiones de interés público". *Íd.*

El Tribunal Supremo de Puerto Rico ha discutido los criterios que este Tribunal de Apelaciones debe considerar al momento de revisar una sentencia dictada sumariamente por el foro de instancia. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679-680 (2018); *Meléndez González et al. v. M. Cuebas*, supra, págs. 118-119. Nuestro más Alto Foro señaló que:

> [E]l Tribunal de Apelaciones debe: (1) examinar de *novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra*, y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al.,* supra, pág. 679.

Conforme a lo anterior, los foros apelativos nos encontramos en la misma posición que el Tribunal de Primera Instancia y utilizamos los mismos criterios para evaluar la procedencia de una

sentencia sumaria. *González Meléndez v. Municipio Autónomo de San Juan y otros,* supra. Por ello, nuestra revisión es una *de novo*, y nuestro análisis debe regirse por las disposiciones de la Regla 36 de Procedimiento Civil, *supra,* y su jurisprudencia interpretativa. *González Santiago v. Baxter Healthcare*, 202 DPR 281, 291 (2019). De esta manera, si entendemos que los hechos materiales realmente están incontrovertidos, debemos revisar *de novo* si el foro primario aplicó correctamente el derecho. *Acevedo Arocho y otros v. Departamento de Hacienda de Puerto Rico y otros,* 2023 TSPR 80, resuelto el 26 de junio de 2023.

### III.

El peticionario solicita que ejerzamos nuestra función discrecional para dejar sin efecto el dictamen del foro primario que denegó su petitorio sumario. Según expresamos anteriormente, y en virtud de la normativa antes expuesta, esta Curia debe revisar *de novo* el petitorio sumario que instó PACI, la correspondiente oposición del Departamento, junto a los respectivos anejos, para así evaluar la procedencia de la expedición del auto de *certiorari,* según nos suplica el peticionario.

Primeramente, constatamos que ambas partes cumplieron los requisitos de forma que exige la Regla 36, *supra.* Por tanto, proseguimos a examinar si existen hechos materiales en controversia que impidan la adjudicación sumaria de este asunto. Destacamos que, los tribunales apelativos estamos en igual posición que el foro sentenciador al revisar un petitorio sumario. Según la Regla 36.3 de Procedimiento Civil, *supra,* quien se opone a que se declare con lugar una solicitud de sentencia sumaria viene obligado a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho el promovente, debe puntualizar los hechos propuestos que pretende controvertir y hacer referencia a la prueba específica que sostiene su posición.

En virtud de lo anterior, examinamos sosegadamente la *Moción Solicitando Sentencia Sumaria* que instó PACI en la cual incluyó cinco (5) hechos propuestos enumerados, junto a los documentos que los sustentan. Asimismo, identificó como único hecho en controversia "si las facturas por servicios profesionales, ascendentes a $378,088.25, [...] están correctas conforme al contrato entre las partes y, por tanto, si deben pagarse."[11]

Al oponerse, el Departamento aceptó como incontrovertido el hecho propuesto número 6 y objetó el resto. Además, reiteró que, en la presente causa existen controversias medulares que impiden la adjudicación por la vía sumaria.[12] Allí también, propuso 50 hechos incontrovertidos adicionales, los cuales sustentó con anejos y con la declaración jurada de Taileen Yazmin Negrón Rivera. Cabe señalar que, la referida declaración jurada detalla las múltiples deficiencias que contienen las facturas que sometió PACI para pago y que son objeto de este pleito. Como resultado de lo anterior, el peticionario instó una réplica en la cual esencialmente reiteró los argumentos previamente expuestos en su petitorio sumario, sin añadir documentos que rebatieran la postura del Departamento.

Evaluado lo anterior, el foro primario denegó la *Moción Solicitando Sentencia Sumaria* que presentó PACI por entender que existen controversias medulares que impiden la adjudicación de la causa por la vía sumaria.

---

[11] Apéndice, pág. 12.
[12] El Departamento señaló cuatro (4) hechos en controversia, a saber:
  1. Si PACI cumplió o no con los requerimientos establecidos en la cláusula THIRD: COMPENSATION del contrato 2019-DS0756 suscrito entre PACI y Salud.
  2. Ante el incumplimiento de PACI con los requerimientos establecidos en la cláusula THIRD: COMPENSATION del contrato 2019-DS0756 suscrito entre PACI y Salud, si Salud estaba obligado o no [a] hacer el desembolso de fondos públicos en pago de la cantidad reclamada en las facturas #100R-2, #103 y #104.
  3. Si la deuda reclamada por PACI es o no una vencida, líquida y exigible. Apéndice, pág. 515.
  4. Si Salud ha incurrido o no en incumplimiento de contrato al no haber realizado el pago de la cantidad reclamada en las facturas #100R-2, #103 y #104 incurriendo así en mora, y por consiguiente al pago de intereses.

A tales efectos, nos compete analizar si, en esta etapa de los procedimientos, el foro primario actuó arbitrariamente o en exceso de su discreción al negarse a dictar sentencia sumaria. Se colige de la *Resolución* impugnada que, el TPI evaluó los planteamientos de ambas partes junto a los documentos que obran en autos y determinó denegar el petitorio sumario de PACI, tras identificar cuatro hechos medulares en controversia, a saber:

1. Si PACI cumplió con los requerimientos establecidos en el contrato suscrito entre PACI y Salud.
2. Si PACI ha presentado evidencia suficiente, y en cumplimiento de las leyes aplicables a contrataciones con fondos públicos, que justifique el desembolso de fondos públicos por la cuantía solicitada en las facturas.
3. Si la cantidad adeudada de $378,088.25 por servicios facturados, cuyo pago exige PACI, es una vencida, líquida y exigible.
4. Si Salud ha incurrido o no en incumplimiento de contrato al no haber realizado el pago de la cantidad reclamada en las facturas incurriendo así en mora, y por consiguiente al pago de intereses.

En su dictamen, el foro primario concluyó que, la deuda reclamada no es líquida ni exigible hasta tanto el peticionario presente la documentación suficiente que cumpla con la Ley Núm. 237-2004, *supra,* y que le permita al recurrido corroborar la corrección y exactitud de las facturas objeto de este litigio. De igual manera, constatamos que el TPI consideró que el Departamento objetó el pago de la cuantía reclamada al recibo de la primera factura.

Tras realizar un examen *de novo* del petitorio sumario y de su correspondiente oposición, y en el ejercicio de nuestra discreción al amparo de los criterios que establece la Regla 40 del Reglamento del Tribunal de Apelaciones, *supra,* somos de la opinión que nuestra intervención no es propicia en esta etapa de los procedimientos. Como se sabe, el mecanismo de sentencia sumaria viabiliza la disposición parcial o total de los litigios civiles en ausencia de una controversia material de hechos que haga necesaria la celebración de un juicio plenario.

En el presente caso, PACI falló en demostrar que el TPI actuó con pasión, prejuicio, parcialidad, incurrió en craso abuso de discreción o en error manifiesto o de derecho al denegar su petitorio sumario, a los fines de que ejerzamos nuestra facultad revisora. Tampoco identificamos fundamento alguno que justifique la expedición del auto de *certiorari* en aras de evitar un fracaso a la justicia. Por tanto, resolvemos abstenernos de intervenir con el dictamen impugnado.

**IV.**

Por los fundamentos antes expuestos denegamos la expedición del auto de *certiorari* según presentado.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones